IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

**FILED**
**June 14, 2021**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0350

WEST VIRGINIA CONSOLIDATED PUBLIC RETIREMENT BOARD,
Respondent Below, Petitioner

v.

ROBERT CLARK, ET AL.,
Petitioners Below, Respondents

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer Bailey, Judge
Civil Action No. 18-AA-9

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

Submitted:  April 13, 2021
Filed:  June 14, 2021

Ronda L. Harvey, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for Petitioner

Lonnie C. Simmons, Esq.
DiPiero Simmons McGinley & Bastress, PLLC
Charleston, West Virginia
Counsel for Respondents

JUSTICE WALKER delivered the Opinion of the Court.
JUSTICE WOOTON concurs in part and dissents in part and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A–5–4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syllabus Point 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

2.      "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syllabus Point 2, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

3.      "'In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meanings.' Syl. pt. 1, *Tug Valley Recovery Center v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979)." Syllabus Point 1, *Thomas v. Firestone Tire & Rubber Co.*, 164 W. Va. 763, 266 S.E.2d 905 (1980).

4.      "The 'body corporate' of the public employees retirement system constitutes a trust. The terms of the trust contract are spelled out in the PERS statute. W.Va. Code § 5–10–1 *et seq*." Syllabus Point 3, *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988).

i

5. "The PERS Trustees have the highest fiduciary duty to maintain the terms of the trust, as spelled out in the statute." Syllabus Point 5, *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988).

6. "The PERS Board, as trustee of retirement funds, must dispose of them according to the law. The board has a fiduciary duty to protect the fund and the interests of all beneficiaries thereof, and it must exercise due care, diligence, and skill in administering the trust." Syllabus Point 14, *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988).

7. "A statute that diminishes substantive rights or augments substantive liabilities should not be applied retroactively to events completed before the effective date of the statute (or the date of enactment if no separate effective date is stated) unless the statute provides explicitly for retroactive application." Syllabus Point 2, *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

8. "'A law is not retroactive merely because part of the factual situation to which it is applied occurred prior to its enactment; only when it operates upon transactions which have been completed or upon rights which have been acquired or upon obligations which have existed prior to its passage can it be considered to be retroactive in application.' Syl. pt. 3, *Sizemore v. State Workmen's Comp. Comm'r,* 159 W.Va. 100, 219 S.E.2d 912 (1975)." Syllabus Point 3, *Re: Petition for Attorney Fees and Costs: Cassella v. Mylan Pharmaceuticals, Inc.*, 234 W. Va. 485, 766 S.E.2d 432 (2014).

9. West Virginia Code § 5-10-44 (eff. July 1, 2015) is a remedial statute that may be applied to correct an error in the Public Employees Retirement System, found at West Virginia Code §§ 5-10-1 to 55, that occurred before July 1, 2015.

10. Under West Virginia Code § 5-10-44(e) (eff. July 1, 2015), the Consolidated Public Retirement Board shall correct in a timely manner any error that results in any member, retirant, beneficiary, entity or other individual receiving from the Public Employees Retirement System, found at West Virginia Code §§ 5-10-1 to 55, more than he or she would have been entitled to receive had the error not occurred.

WALKER, Justice:

Since 1996, the West Virginia Division of Natural Resources (DNR) has paid Natural Resources Police Officers a "subsistence allowance" to cover their phone service, dry cleaning, and meals. Beginning in 1997, DNR reported those payments to the Consolidated Public Retirement Board (the Board) as part of the officers' "compensation," a key component in the calculation of their retirement annuities under the Public Employees Retirement System (PERS). In 2014, the Board determined that the subsistence allowance is not "compensation," for purposes of PERS, and that the error had impacted the calculation of officers' and DNR's contributions to PERS as well as the amount of benefits paid to retired officers. The Board selected several means to correct the error, including recapturing benefit overpayments made to retired officers.

Respondents—current and retired officers and their widowers and widows—unsuccessfully challenged the benefit determination to the Board. But they prevailed before the circuit court, which reversed the Board's ruling. Now, we reverse in part and affirm in part the circuit court's order. We find, contrary to the circuit court, that the subsistence allowance is not "compensation," under PERS. But, like the circuit court, we find that the Board may not recover the excess retirement benefits already paid due to the erroneous treatment of the subsistence allowance as PERS compensation.

# I. FACTUAL AND PROCEDURAL HISTORY

Respondents are active or retired law enforcement officers employed by DNR.[1] West Virginia Code § 20-7-1c (2017) sets officers' minimum annual salary (base pay), keyed to years of service and rank. Under § 20-7-1(i) (2015),[2] officers receive a "subsistence allowance" of $130 each month, in addition to their base pay. The subsistence allowance is for officers' "required telephone service, dry cleaning or required uniforms, and meal expenses while performing their regular duties in their area of primary assignment[.]"[3] DNR also pays an officer's actual expenses incurred working outside that area.[4] The amount of the subsistence allowance does not vary, and it is paid to an officer when he is working or on paid annual, military, or sick leave. Officers on unpaid leave do not receive the allowance.[5]

---

[1] Respondents also include widows and widowers of officers, who receive retirement benefits through their deceased spouse's prior employment.

[2] The Legislature has amended this statute frequently. For purposes of this analysis, we rely on the version of the statute effective May 31, 2015. In 2017, the Legislature amended subsection (i) so that now officers receive $60 per biweekly pay. W. Va. Code § 20-7-1 (eff. April 8, 2017).

[3] W. Va. Code § 20-7-1(i).

[4] *Id*. § 20-7-1(h). So, in a single month, DNR may pay an officer's base salary, the subsistence allowance, and actual expenses incurred when he or she worked outside his/her assigned area (if any).

[5] These facts are drawn from the parties' joint stipulations of fact submitted to the hearing examiner.

The Legislature enacted the subsistence allowance in its near-current form in 1996.[6]  Beginning in March 1997, DNR treated the subsistence allowance as part of officers' "compensation" under PERS.[7]  Section 5-10-2(8) of PERS defines "compensation" as:

> the remuneration paid a member by a participating public employer *for personal services rendered* by the member to the participating public employer. . . .  Any lump sum or *other payments paid to members that do not constitute regular salary or wage payments are not considered compensation* for the purpose of withholding contributions for the system or for the purpose of calculating a member's final average salary. These payments include, *but are not limited to*, attendance or performance bonuses, one-time flat fee or lump sum payments, payments paid as a result of excess budget, or employee recognition payments. The board shall have final power to decide whether the payments shall be considered compensation for purposes of this article[.][8]

For clarity, we refer to such remuneration as "pensionable compensation."

DNR reports employees' gross salary to the Board, along with its own and its employees' corresponding contributions to PERS.  For officers, that gross salary amount

---

[6] The subsistence allowance had first appeared in 1976, 1976 W. Va. Acts 94, then disappeared in 1981, 1981 W. Va. Acts 1975, before reappearing in 1996.  1996 W. Va. Acts 198.

[7] It appears- from the record that DNR reached this determination based on its - conclusion that the allowance was subject to state and federal income taxes, Medicare, and Social Security.  The parties agree that the tax treatment of the allowance does not bear on whether the allowance is pensionable compensation.

[8] W. Va. Code § 5-10-2(8) (2016) (emphasis added).

3

included the subsistence allowance.[9] By including the allowance as part of officers' gross salary reported to the Board, DNR increased the officers' pensionable compensation. Increased pensionable compensation means increased inputs to, and outputs from, PERS. As for inputs, the amount of an employee's total, annual pensionable compensation dictates the amount of money the officers and DNR must contribute to PERS.[10] And as for outputs, PERS retirement annuities are calculated based on, in part, an employee's "final average salary," a figure derived from an employee's annual, pensionable compensation.[11] The Board offers training to employers on what is and what is not pensionable compensation, and will advise an employer whether a particular payment is subject to PERS upon request.[12] DNR did not ask the Board whether the allowance was pensionable compensation.

---

[9] *See* W. Va. Code 5-10-19 (1990) (amended 2021, eff. July 6, 2021) (obligating participating employers to file a detailed statement of all service rendered by employees).

[10] *See id.* § 5-10-29 (2015) (stating that for those who became PERS members before July 1, 2015, "the contributions of a member to the retirement system . . . shall be a sum of not less than three and five-tenths percent of his or her annual compensation but not more than four and five-tenths percent of his or her annual compensation") and § 5-10-31 (2014) (directing that "the participating public employers' contributions to the retirement system . . . shall be a percent of the members' total annual compensation related to benefits under this retirement system").

[11] *See id.* § 5-10-2(13)(A) and (B) (2016).

[12] The record does not reflect the last time the Board provided training to DNR's payroll personnel.

4

In 2014, officer Jon Cogar asked the Board to estimate his PERS retirement benefits. The Board audited Mr. Cogar's file and noticed "atypical" salary payments. The Board contacted DNR in March 2014 and asked for a report of any special payments made to Mr. Cogar since June 2006, from which retirement contributions had been withheld. DNR sent the requested report, in which it broke down those special payments by DNR payment code, including "135 Subsistence." The report showed that Mr. Cogar had received a $65.00 subsistence allowance, bimonthly, from June 2006 until March 2014. At the Board's request, DNR prepared a "PERS Inflated Salary Classification Form," to permit the Board to determine whether the allowance met the criteria for "compensation" under PERS.

On April 23, 2014, the Board notified DNR that because the subsistence allowance had not been paid for personal services rendered, it was not "compensation" under PERS. The Board directed DNR to stop withholding retirement contributions from the subsistence allowance. Then, on April 29, 2014, the Board notified Mr. Cogar of its determination. In July 2014, DNR advised the Board that it disagreed with that determination.[13] Later, the Board informed DNR and Mr. Cogar that it was taking another look at whether the subsistence allowance was, in fact, pensionable. The Board also

---

[13] DNR did not contest the exclusion of the subsistence allowance from compensation for new hires.

5

instructed DNR to "maintain the status quo – *i.e.*, continue treating subsistence payments received by [officers] as compensation and salary for purposes of PERS."

In October 2015, the Board informed all DNR law enforcement officers—active and retired—that it had finally determined that the subsistence allowance was not pensionable compensation. The Board advised retired officers, including Mr. Cogar, that they were entitled to be paid back the excess contributions they had made to PERS due to the erroneous treatment of the allowance as pensionable compensation. The Board also informed the retired officers that if further inquiry showed that the allowance had been included in their "final average salary,"[14] then the Board had to (1) recover any benefits overpaid to the retired officers, either by lump sum, lifetime reduction of benefits, or reduction of benefits over a set period of time, offset by any excess contributions they may

---

[14] *See* W. Va. Code § 5-10-2(13).

6

have made to PERS[15] and (2) adjust their retirement annuities prospectively to the correct monthly annuity amount.[16]

Respondents filed a joint administrative appeal and request for declaratory relief[17] with the Board, arguing, among other things, that the allowance is compensation for services rendered—meaning it is pensionable compensation—and that the Board's determination violated their vested pension rights. The hearing examiner issued a recommended decision finding that under the plain language of the pertinent statutes, the allowance was not pensionable compensation and that both the 2011 and 2015 versions of the PERS error "correction statute," West Virginia Code § 5-10-44,[18] plus the Board's

---

[15] At the Board's direction, DNR stopped depositing employee and employee contributions to PERS based on the allowance on November 1, 2015. In an example included in the joint stipulation of facts submitted to the administrative law judge, the Board's proposed corrections would have decreased a hypothetical officer's monthly annuity from $3,314.94 to $2,715.62 for sixty months, while the officer repaid the overpayments to PERS. After that sixty-month period, the officer would receive the "correct" monthly benefit of $3,042.64. Overall, that example officer would owe $19,620.90 in benefit overpayments because of the erroneous treatment of the allowance as pensionable compensation.

[16] The Board informed active officers that (1) all erroneous employee contributions would be returned, and (2) subsistence payments would not be treated as pensionable compensation when (or if) the officers retired from DNR.

[17] In the joint stipulations of fact submitted to the hearing examiner, the parties represented that: "The Applicants have appealed the CPRB's decision regarding subsistence allowance pursuant to W. Va. Code R. § 162-2-7 and seek a declaratory judgment pursuant to W. Va. Code § 29A-4-1. Their appeals have been consolidated by agreement of the parties."

[18] The language of those various versions of § 5-10-44 is set out, *infra*.

7

fiduciary duties, permitted it to recover benefit overpayments made to retired Respondents. The Board adopted the hearing examiner's recommended order in December 2017,[19] and Respondents appealed to circuit court.[20]

By order entered March 19, 2020, the circuit court reversed the Board's final order. First, the court found that the allowance was compensation because Respondents received those payments so long as they were not on unpaid leave. From that, the circuit court inferred that the payments were, in fact, "for services rendered," and so were pensionable compensation. The court was also persuaded by Respondents' argument that the list of exceptions in § 5-10-2(8) did not include the allowance, meaning that the Legislature hadn't expressed an intention to keep the allowance out of PERS compensation. The court rejected the Board's plain-language arguments and its position that its interpretation of "compensation" in this case should be afforded deference, as it is the agency charged with implementing PERS.

---

[19] Respondents moved the Board to order that its ruling applied to active and retired officers and their widows and widowers who were not parties to the joint appeals. The Board denied the motion on the basis that class actions are not permitted in administrative appeals.

[20] The hearing examiner issued a single recommended decision. But, the officers appealing from Board's final order filed individual appeals with the circuit court, as recounted in the "Agreed Order," entered by the circuit court on February 5, 2018. In the interest of "judicial economy and efficiency," the circuit court consolidated the individual appeals into Respondent Robert Clark's appeal, Civil Action No. 18-AA-9. Attached to the Agreed Order was list of all appellants whose cases were consolidated into Civil Action No. 18-AA-9.

The court also found that DNR's inclusion of the allowance in compensation was not an "employer error," correctable under § 5-10-44 (2011) because (1) there was no error to begin with, and (2) DNR's treatment of the allowance as pensionable compensation was "deliberate," so it was excluded from the definition of "employer error."[21] And, the court found that the Board had not acted to correct the error in a timely fashion because DNR had treated the subsistence allowance as a form of PERS compensation since 1997, and the Board should have discovered at some point earlier than 2014 that the payment was not pensionable compensation. Finally, the court found that the Board's attempt to recoup overpayments from Respondents violated their vested property rights in their pensions.[22] The Board appeals.

## II. STANDARD OF REVIEW

Our standard of review in this administrative case is set forth in Syllabus Points 1 and 2 of *Muscatell v. Cline*:

> 1. On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative

---

[21] W. Va. Code § 5-10-2(12) (2016).

[22] *See* Syl. Pt. 7, in part, *Booth v. Sims*, 193 W. Va. 323, 456 S.E.2d 167 (1995), *modified* (Mar. 24, 1995) ("But substantial employee participation in the system *does* create an employee's reliance interest in pension benefits. An employee's membership in a pension system and his or her forbearance in seeking other employment prevents the legislature from impairing the obligations of the pension contract once the employee has performed a substantial part of his or her end of the bargain and relied to his or her detriment.").

officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.[23]

2. In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*.[24]

The parties do not dispute the facts giving rise to this appeal, so we are presented with questions of law, which we review *de novo*.[25]

## III. ANALYSIS

The Board challenges the circuit court's order on three grounds. First, the Board contends that the subsistence allowance authorized by West Virginia Code § 20-7-1(i) is not "compensation," as that term is defined for purposes of PERS in § 5-10-2(8), and contrary to the circuit court's reading of those statutes. Second, the Board contests the circuit court's finding that neither the 2005, 2011, nor 2015 version of § 5-10-44, the

---

[23] Syl. Pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996); *see* W. Va. Code § 29A-5-4(g) (1998) (the court "shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision or order are: (1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.").

[24] Syl. Pt. 2, *Muscatell*, 196 W. Va. at 588, 474 S.E.2d at 518.

[25] *Id*.

"correction statute," authorizes it to recoup benefits overpayments to retirants to correct the inclusion of the subsistence allowance in those retirants' pensionable compensation. Third, the Board argues that the circuit court misapprehended this Court's holding in *Booth v. Sims*, and that that case is not applicable to the Board's action as plan administrator to enforce the terms of PERS. We address these arguments in order.[26]

**A.     Subsistence Allowance as "Compensation" under PERS**

The Legislature created the subsistence allowance in West Virginia Code § 20-7-1(i). Under that statute, "[n]atural resources police officers shall receive, in addition to their base pay salary, a minimum monthly subsistence allowance for their required telephone service, dry cleaning or required uniforms, and meal expenses while performing their regular duties in their area of primary assignment in the amount of $130 each month."[27]  In West Virginia Code § 5-10-2(8), the Legislature defined pensionable compensation as "the remuneration paid a member by a participating public employer for personal services rendered by the member to the participating public employer."  These definitions matter because under the terms of PERS, if a payment from a participating

---

[26] The Board's brief does not contain assignments of error. *See* W. VA. R. APP. PRO. 10(c)(2) (requiring the petitioner's brief to open "with a list of the assignments of error that are presented for review, expressed in terms and circumstances of the case but without unnecessary detail"). That nonconformity does not hinder our analysis of the parties' arguments, however, so we do not linger on this point.

[27] Section 20-7-1(i) also specifies that special and emergency natural resource officers shall not receive the subsistence allowance.

11

public employer to a public employee fits the definition of "compensation" under PERS, then the payment is treated as part of the employee's pensionable compensation, increasing contributions to PERS, the employee's final average salary, and the retirement annuity.

When a statute plainly expresses the intent of the Legislature, we do not construe or interpret it.[28] We apply it.[29] After comparing §§ 5-10-2(8) and § 20-7-1(i), we conclude that those statutes clearly express the Legislature's intent that the "subsistence allowance" is not "compensation," as defined in § 5-10-2(8), and so is not subject to PERS.

The subsistence allowance mandated by § 20-7-1(i) is a bimonthly payment of $65 paid by DNR "for [officers'] required telephone service, dry cleaning or required uniforms, and meal expenses while performing their regular duties in their area of primary assignment." Section 20-7-1(i) provides that the allowance is to be paid to officers "in addition to [officers'] base pay salary," an amount specified in § 20-7-1c.[30] "'In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meanings.' Syl. pt. 1, *Tug Valley Recovery Center v.*

___

[28] *See* Syl. Pt. 1, *Smith v. State Workmen's Comp. Com'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975) ("The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.").

[29] *See* Syl. Pt. 2, *State v. Epperly,* 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

[30] *See* W. Va. Code § 20-7-1c (setting forth officers' annual salaries in two charts entitled, "ANNUAL SALARY SCHEDULE (BASE PAY)").

*Mingo County Commission, W.Va.*, 164 W.Va. 94, 261 S.E.2d 165 (1979)."[31] The common meaning of "salary" is "[a]n agreed compensation for services[.]"[32] This Court "must presume that a legislature says in a statute what it means and means in a statute what it says there."[33] So, we must presume that the Legislature meant to distinguish the allowance from the officers' salary, i.e., their compensation for services, when it said that the allowance is to be paid to officers "in addition to [their] base pay salary[.]"[34] The Legislature clearly expressed in § 20-7-1(i) that the allowance is not paid to officers in exchange for their

[31] Syl. Pt. 1, *Thomas v. Firestone Tire & Rubber Co.*, 164 W. Va. 763, 266 S.E.2d 905 (1980).

[32] *Salary*, BLACK'S LAW DICTIONARY (10th ed. 2004).

[33] *Martin v. Randolph Cty. Bd. of Educ.,* 195 W. Va. 297, 312, 465 S.E.2d 399, 414 (1995) (citation omitted).

[34] W. Va. Code § 20-7-1(i) (emphasis added). Similarly, we must presume the Legislature meant what it said when it stated that "[t]he board shall have final power to decide whether the payments shall be considered compensation for purposes of this article[.]" W. Va. Code § 5-10-2(8); s*ee also* W. Va. Code § 5-10-17(e) (2015) (granting the Board "final power" to decide question regarding an employee's status as a PERS member) and (f) (granting the Board "final authority" to resolve questions regarding a person's status as a "leased employee"). This provision emphasizes and reinforces that the Board operates under "the highest fiduciary duty to maintain the terms of the trust, as spelled out in the [PERS] statute." Syl. Pt. 5, in part, *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988). Practically, the provision means that a participating public employer's determination whether a particular payment is pensionable compensation does not trump the Board's determination of that question—subject, of course, to judicial review. W. Va. C.S.R. § 162-2-8 (providing that "[a]n individual aggrieved by a final decision of the Board has a right of appeal to the Circuit Court of Kanawha County pursuant to W. Va. Code § 29A-5-4"); *see also* Syl. Pt. 6, *Repass v. Workers' Comp. Div.*, 212 W. Va. 86, 569 S.E.2d 162 (2002) ("'The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute.' Syl. pt. 5, *CNG Transmission Corp. v. Craig*, 211 W.Va. 170, 564 S.E.2d 167 (2002).").

services because it is money paid to officers in addition to their salary. So, the allowance cannot be "compensation," as that term is defined in § 5-10-2(8): "the remuneration paid a member by a participating public employer for personal services rendered by the member to the participating public employer."[35]

The circuit court construed §§ 5-10-2(8) and 20-7-1(i)—despite those statutes' clear language—and we pause to consider the reasoning behind its conclusion that the allowance is, in fact, compensation for services rendered by officers.[36] The circuit court reasoned that the subsistence allowance did not fit within the general definition of payments made to public employees, but which must be excluded from compensation. But, this construction ignores important parts of the exclusionary language in § 5-10-2(8), which provides that:

> Any lump sum or *other payments* paid to members that do not constitute regular salary or wage payments are not considered compensation for the purpose of withholding contributions for the system or for the purpose of calculating a member's final average salary. These payments include, *but are not limited to*, attendance or performance bonuses, one-

---

[35] *Id*. § 5-10-2(8). Moreover, had the Legislature intended the bimonthly, $65 allowance to compensate officers for services rendered, it could have increased their base pay salary by that amount.

[36] The circuit court also reasoned that because officers do not receive the subsistence allowance while on unpaid leave, it is necessarily paid in consideration for personal services. We disagree based on the plain language of § 20-7-1(i).

time flat fee or lump sum payments, payments paid as a result
of excess budget, or employee recognition payments.[37]

The first sentence quoted above states that a "lump sum *or* other payment" that is not also a "regular salary or wage payment" is not pensionable compensation.[38]  The second sentence of § 5-10-2(8) lists a series of lump sum payments excluded from compensation, under PERS.  But, the Legislature made plain that those lump sum payments are not the *only* payments excluded from pensionable compensation when it stated that excluded payments "include, *but are not limited to*, attendance or performance bonuses, one-time flat fee or lump sum payments, payments paid as a result of excess budget, or employee recognition payments."[39]  We have observed that "the phrase, 'include, but not be limited to[,]' . . . indicates that the examples given are demonstrative, not exclusive."[40]

---

[37] W. Va. Code § 5-10-2(8) (emphasis added).

[38] *Id*. (emphasis added).

[39] *Id*. (emphasis added).

[40] *Tex. E. Transmission, LP v. W. Va. Dep't of Env't Prot., Div. of Mining & Reclamation*, 240 W. Va. 131, 143, 807 S.E.2d 802, 814 (2017) (citing *Postlewait v. City of Wheeling*, 231 W. Va. 1, 4, 743 S.E.2d 309, 312 (2012) (observing "*Black's Law Dictionary* (9th Ed. 2009) defines the term 'include' as 'to contain as a part of something,' and says that the term 'typically indicates a partial list.... But some drafters use phrases such as including without limitation and including but not limited to—which mean the same thing.' Accordingly, by using the word 'includes' in Rule 6(a), this Court was setting forth only a partial list of legal holidays."); *Davis Mem'l Hosp. v. West Virginia State Tax Comm'r*, 222 W. Va. 677, 684, 671 S.E.2d 682, 689 (2008) (recognizing that "[t]he term 'includ[es]' in a statute is to be dealt with as a word of enlargement and this is especially so where ... such word is followed by 'but not limited to' the illustrations given." (quotations and citations omitted)).

15

So, the words "include, but are not limited to" in § 5-10-2(8) indicate that the payments listed there are merely examples of payments excluded from the definition of "compensation" under PERS.

Section 5-10-2(8) plainly states that a payment may be excluded from pensionable compensation if the payment is not a "regular salary or wage payment." The subsistence allowance is neither of those, and the Legislature said as much when it (1) described the allowance as a payment to DNR officers "for their required telephone service, dry cleaning or required uniforms, and meal expenses while performing their regular duties in their area of primary assignment;" and (2) distinguished it from officers' base pay salary. We agree with the reasoning of an Indiana court faced with a similar issue, which found that a clothing allowance was not remuneration subject to a pension plan: "Admittedly, the clothing allowance is a form of compensation in that it does relieve the recipient of the necessity of making clothing expenditures from his usual remuneration. But the annual cash payment is supplemental to, and not an integral part of, the employee's *regular salary*."[41]

---

[41] *Hilligoss v. LaDow*, 368 N.E.2d 1365, 1371 (Ind. App. 1977) (emphasis in original); *see also Banish v. City of Hamtramck*, 157 N.W.2d 445, 449 (Mich. Ct. App. 1968) ("Had the city of Hamtramck furnished uniforms to be worn by the employees during their time of service, we doubt whether it would be suggested the value of the uniforms was compensation. The form of payment is not controlling—whether dollars or coconuts. What is important is whether the payment is a payment for services rendered or to be rendered.").

16

Finally, the circuit court applied two rules of statutory construction to conclude that the allowance is pensionable compensation.  Those rules are *ejusdum generis* and *noscitur a sociis*.  Under the first rule, "where general words follow the enumeration of particular classes of persons or things, the general words, under the rule of construction known as *ejusdem generis*, will be construed as applicable only to persons or things of the same general nature or class as those enumerated[.]"[42]  And under the second, "the meaning of a general word is or may be known from the meaning of accompanying specific words."[43]

These rules do not support the circuit court's conclusion for two reasons. First, *ejusdum generis* applies only to general words that follow a list of classes or things.  When presented in that order, "general words do not amplify particular terms preceding them but are themselves restricted and explained by the particular terms."[44]  Here, the general words, "other payment," *precede* the list of lump sum payments, and so are neither restricted nor explained by the list that follows.  Second, "[t]he maxim *noscitur a sociis* is only a guide to legislative intent, though, and so, like any rule of construction, does not

---

[42] Syl. Pt. 2, in part, *Parkins v. Londeree*, 146 W. Va. 1051, 124 S.E.2d 471 (1962).

[43] *Murray v. State Farm Fire & Casualty Co.*, 203 W. Va. 477, 485, 509 S.E.2d 1, 9 (1998).

[44] *Parkins*, 146 W. Va. at 1062, 124 S.E.2d at 477; *see also* ANTONIN SCALIA AND BRYAN A. GARNER, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS 205 (2012) ("So, the *ejusdem generis* canon is properly limited to its traditional application: a series of words followed by a general.")

17

apply absent ambiguity, or to thwart legislative intent, or to make general words meaningless."[45] As stated above, the Legislature's intent for the subsistence allowance is plain: to pay officers for their required telephone service, etc., rather than for services rendered.[46] The doctrines of *ejusdum generis* and *noscitur a sociis* are red herrings. In sum, contrary to the circuit court, we find that the subsistence allowance paid to officers under § 20-7-1(i) is not "compensation," under PERS.

**B.    Correction of Overpayments**

Considering that conclusion, DNR's inclusion of the allowance in Respondents' compensation reported to PERS was error. That error resulted in both inflated contributions to PERS by DNR and Respondents and inflated final average salaries. For those Respondents who were paid the allowance after March 1997, and who

---

[45] 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:16 (7th ed.) (internal notes omitted).

[46] For this reason, we also reject the circuit court's conclusion that had the Legislature intended for the subsistence allowance not to be "compensation" under § 5-10-2(8), it would have included specific language to that effect, as it did in West Virginia Code §§ 5-5-6(c)(3) (2009) (payment for unused sick leave may not be part of final average salary); 5-10-22(a) (2009) (final average salary does not include any lump sum payment for unused, accrued leave "of any kind or character"); and 5-5-3 (2004) ("lump sum payment for unused, accrued leave of any kind or character may not be a part of final average salary computation"). The Legislature did include specific language excluding the subsistence allowance from pensionable compensation because it specified that the allowance was paid for DNR officers' required telephone service, etc., and did not otherwise indicate that the allowance was paid to DNR officers for personal services rendered.

then retired sometime after that and before November 1, 2015, the error means that they have received erroneously high retirement annuity payments.

The parties agree that, under the terms of PERS, the Board must correct errors, including the erroneous inclusion of the allowance in Respondents' pensionable compensation. But, they dispute whether the Board may correct the error at issue in this case which has resulted in, among other things, overpayments of benefits to certain Respondents. Resolution of that disagreement hinges on West Virginia Code § 5-10-44, the PERS error correction statute.

### 1. *West Virginia Code § 5-10-44*

Section 5-10-44 was enacted in 1961, amended in 2005 and 2011, and, finally, rewritten in 2015. The facts of this case span all four iterations of the statute: the error in 1997 (1961 version), the Board's realization of the error in 2014 (2011 version), and the Board's determination of the error and remedies in October 2015 (2015 version). According to the circuit court, the 2011 version of the error correction statute applies to these cases because that was the error correction statute in effect when CPRB "discovered" the erroneous inclusion of the allowance as pensionable compensation. But, according to the Board, § 5-10-44, effective July 1, 2015, applies here because the statute is remedial and so may be applied to correct DNR's erroneous determination that the allowance is pensionable compensation, made before the effective date of the 2015 amendment. This distinction matters when one compares the 2011 and 2015 versions of § 5-10-44. Before

19

2015, the statute did not speak to overpayments. But in 2015, the Legislature added new language to § 5-10-44 that expressly requires members to return benefit overpayments to PERS, subject to certain exceptions.[47] For the reasons discussed below, we find that § 5-10-44 (2015) is a remedial statute, so that its terms may be applied to correct an error in PERS occurring before the amended statute's effective date, July 1, 2015.

We have described PERS as both a statute and a trust. "The 'body corporate' of [PERS] constitutes a trust. The terms of the trust contract are spelled out in the PERS statute. W.Va. Code § 5–10–1 *et seq.*"[48] The Board manages and administers PERS,[49] and the Trustees have "the highest fiduciary duty to maintain the terms of the trust, as spelled out in the [PERS] statute."[50] "The PERS Board, as trustee of retirement funds, must dispose of them according to the law. The board has a fiduciary duty to protect the fund

---

[47] The Board represents that it has sought repayment from retirants of overpaid PERS benefits before the Legislature amended § 5-10-44 in 2015. Because we find that § 5-10-44(e) may be applied retroactively, subject to the limitations discussed elsewhere in this opinion, it is not necessary to consider the parties' arguments regarding the Board's authority to do so under earlier versions of the statute. *See State ex rel. ACF Indus., Inc. v. Vieweg*, 204 W. Va. 525, 533 n.13, 514 S.E.2d 176, 184 n.13 (1999) (noting that "this Court cannot issue an advisory opinion with respect to a hypothetical controversy" where "the statutory problems which the petitioning employers anticipate appear[ed] to be primarily conjectural").

[48] Syl, Pt. 3, *Dadisman*, 181 W. Va. at 779, 384 S.E.2d at 816.

[49] W. Va. Code §§ 5-10-5 (1990) and 5-10D-1 (2020).

[50] Syl. Pt. 5, *Dadisman*, 181 W. Va. at 779, 384 S.E.2d at 816.

and the interests of all beneficiaries thereof, and it must exercise due care, diligence, and skill in administering the trust."[51]

To that end, the Legislature included in PERS the error correction statute, § 5-10-44, requiring the Board to correct errors that result in a person receiving more or less than he is entitled to under PERS.[52] As enacted in 1961, § 5-10-44 provided that:

> Should any change or error in the records of any participating public employer or the retirement system result in any person receiving from the system more or less than he would have been entitled to receive had the records been correct, the board of trustees shall correct such error, and as far as is practicable shall adjust the payment of the benefit in such manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.[53]

The 2005 amendments to the statute were modest.[54] The Legislature maintained in near-identical form the text of the original statute, but added a provision relating specifically to underpayments to PERS.[55] In 2011, the Legislature again preserved

---

[51] Syl. Pt. 14, *id.*

[52] *See* 207 W. Va. Acts 2015 (codified at W. Va. Code § 5-10-44); 150 W. Va. Acts 2011 (codified at W. Va. Code § 5-10-44); 201 W. Va. Acts 2005 (codified at W. Va. Code § 5-10-44); and 118 W. Va. Acts 1961 (codified at W. Va. Code § 5-10-44).

[53] 118 W. Va. Acts 1961.

[54] 201 W. Va. Acts 2005.

[55] *Id.* ("Any employer error resulting in an underpayment to the retirement system may be corrected by the employee remitting the required employee contribution and the participating public employer remitting the required employer contribution.").

the original statute's general charge that the Board correct system errors.[56] It refined the "payment adjustment" portion of the earlier versions of the statute, specifying that when "correction of the error occurs after the effective retirement date of a retirant, and as far as is practicable, the board shall adjust the payment of the benefit in a manner that the actuarial equivalent of the benefit to which the retirant was correctly entitled shall be paid."[57] The Legislature also expanded that portion of § 5-10-44 controlling correction of underpayments to PERS and added language directing the Board how to handle mistaken or excess contributions to the system.[58]

The Legislature amended § 5-10-44, again, in 2015.[59] It restated the general error correction provision, so that it now directs that,

> General rule: Upon learning of any errors, the board shall correct errors in the retirement system in a timely manner whether an individual, entity or board was at fault for the error with the intent of placing the affected individual, entity and retirement board in the position each would have been in had the error not occurred.

---

[56] 150 W. Va. Acts 2011.

[57] *Id.*

[58] *Id.*

[59] 207 W. Va. Acts 2015.

In amending § 5-10-44 in 2015, the Legislature also specified in new subsection (e), "Overpayments from the retirement system," that "[i]f any error results in any member, retirant, beneficiary, entity or other individual *receiving from the system more than he would have been entitled to receive had the error not occurred*," then (1) the Board must "prospectively adjust the payment of the benefit to the correct amount," where the "correction of the error occurs after annuity payments to a retirant or beneficiary have commenced," and (2) "the member, retirant, beneficiary, entity or other person who received the overpayment from the retirement system shall repay the amount of any overpayment to the retirement system[.]"[60] The Board "shall correct the error in a timely manner."[61] In full, subsection (e) of § 5-10-44 states that:

> Overpayments from the retirement system: If any error results in any member, retirant, beneficiary, entity or other individual receiving from the system more than he would have been entitled to receive had the error not occurred, the board shall correct the error in a timely manner. If correction of the error occurs after annuity payments to a retirant or beneficiary have commenced, the board shall prospectively adjust the payment of the benefit to the correct amount. In addition, the member, retirant, beneficiary, entity or other person who received the overpayment from the retirement system shall repay the amount of any overpayment to the retirement system in any manner permitted by the board. Interest shall not accumulate on any corrective payment made to the retirement system pursuant to this subsection.

---

[60] W. Va. Code § 5-10-44(e) (2015) (emphasis added).

[61] *Id.*

23

These amendments are variations on the central theme of the original, 1961 statute: when correcting an error in PERS, the Board's aim is to turn back the clock and so return the "the affected individual, entity and retirement board"[62] to the position each would have occupied, but for the system error.[63]

"A statute is presumed to be prospective in its operation unless expressly made retrospective[.]"[64] "A statute that diminishes substantive rights or augments substantive liabilities should not be applied retroactively to events completed before the effective date of the statute (or the date of enactment if no separate effective date is stated) unless the statute provides explicitly for retroactive application."[65] We have held that

> "A law is not retroactive merely because part of the factual situation to which it is applied occurred prior to its enactment; only when it operates upon transactions which have been completed or upon rights which have been acquired or upon obligations which have existed prior to its passage can it be considered to be retroactive in application." Syl. pt. 3,

---

[62] *Id.* § 5-10-44(a).

[63] *See Flanigan v. W. Va. Pub. Emp. Ret. Sys.*, 176 W. Va. 330, 336, 342 S.E.2d 414, 420 (1986).

[64] W. Va. Code Ann. § 2-2-10(bb) (2017).

[65] Syl. Pt. 2, *Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

*Sizemore v. State Workmen's Comp. Comm'r*, 159 W.Va. 100, 219 S.E.2d 912 (1975).[66]

But, "[s]tatutes which do not create new rights or take away vested ones are deemed to be remedial and are not within the strict application of the rule of presumption against retroactivity."[67] "A remedial statute improves or facilitates remedies already existing for the enforcement or rights of redress of wrongs,"[68] and may "include statutes intended for the correction of defects, mistakes, and omissions in the civil institutions and the administration of the state."[69]

We concur with the Board that the Legislature's 2015 amendments to § 5-10-44 are remedial[70] and can be applied to correct errors in PERS occurring before the amended statute's effective date of July 1, 2015. The 2015 amendments did not create or diminish substantive rights under PERS; instead, they improved the Board's ability to

---

[66] Syl. Pt. 3, *Re: Petition for Attorney Fees and Costs: Cassella v. Mylan Pharm., Inc.*, 234 W. Va. 485, 766 S.E.2d 432 (2014).

[67] *Martinez v. Asplundh Tree Expert Co.*, 239 W. Va. 612, 617, 803 S.E.2d 582, 587 (2017) (internal quotation omitted).

[68] *Id*. at 618, 803 S.E.2d at 588.

[69] 73 AM. JUR. 2d STATUTES § 7 (1964).

[70] *Cf.* Syl. Pt. 6, *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 474 S.E.2d 906 (1996) ("Though a workers' compensation statute, *or amendment thereto*, may be construed to operate retroactively where mere procedure is involved, such a statute or amendment may not be so construed where, to do so, would impair a substantive right.") (emphasis added).

25

remedy errors in the administration of the trust contract set forth in PERS.[71]  In the context

presented here—an error that has, among other things, resulted in a person "receiving from

the system more than he would have been entitled to receive had the error not occurred"[72]—

the amendment provides for the return of those overpayments to PERS, meaning that the

Board may recover sums distributed in the past due to a system error.  Importantly, the

Board may pursue this remedy only when "a retirant, beneficiary, entity or other individual

receiv[es] from the system more than he would have been entitled to receive had the error

not occurred," that is, when the recipient of the funds did not have a right under the terms

of PERS to receive them.[73]  The statute does not take away a vested right.  Rather, it enables

---

[71] *See* S.B. 342, 85th Leg., Reg. Sess. (W. Va. 2015) (titled, in part, "clarifying scope, application and requirements for error correction by CPRB").

[72] W. Va. Code § 5-10-44(e).

[73] As we found above, the allowance is not, under the terms of PERS, pensionable compensation, nor has it ever been.  Thus, no promise was made upon which Respondents—active or retired—could have relied to their detriment regarding the allowance's status as pensionable compensation. *Compare Myers v. W. Va. Consol. Pub. Ret. Bd.*, 226 W. Va. 738, 754 n.7, 704 S.E.2d 738, 754 n.7 (2010) (noting that while petitioner "may have relied on the Board's erroneous representation that he would receive service credit for those two months, the Board is statutorily bound by West Virginia Code § 5–10–44 to correct errors in the calculation of a PERS member's service credit. . . .  The statute does not limit this requirement for equitable reasons") *with Curry v. W. Va. Consol. Pub. Ret. Bd.*, 236 W. Va. 188, 193, 778 S.E.2d 637, 642 (2015) (employee detrimentally relied on legislative rule defining "full time" employment that was in effect at the time petitioner was hired by the West Virginia Department of Agriculture, so that rule, and not later, amended version applied to determine whether petitioner was entitled to participate in PERS). *See also Booth*, 193 W. Va. at 340, 456 .S.E.2d at 184 ("The cynosure, then, of an employee's *W.Va. Const.* art. III, § 4 contract right to a pension is not the employee's or even the government's contribution to the fund; rather, it is the government's *promise to pay*.") (emphasis in original).

26

the Board to ensure the integrity of PERS and protect the interests of all of its

beyond.[74] For those reasons, we now hold that West Virginia Code § 5-10-44 (eff.

[74] The Board contends that the circuit court erred when it found that the DNR's inclusion of the subsistence allowance in the Respondents' pensionable compensation was a "deliberate act," and so was not an "employer error" that the Board could correct. *See* W. Va. Code § 5-10-2(12) ("'Employer error' means an omission, misrepresentation or violation of relevant provisions of the West Virginia Code or of the West Virginia Code of State Regulations or the relevant provisions of both the West Virginia Code and of the West Virginia Code of State Regulations by the participating public employer that has resulted in an underpayment or overpayment of contributions required. A deliberate act contrary to the provisions of this section by a participating public employer does not constitute employer error[.]").

We agree. Initially, subsection (a) of § 5-10-44 (2015), states that "[u]pon learning of *any* errors, the board shall correct errors in the retirement system," not simply "employer errors." *Compare* W. Va. Code § 5-10-44(a) (2011) (directing the Board to correct "any change or employer error in the records of any participating public employer . . . result[ing] in any member . . . receiving from the system more or less that he or she would have been entitled to receive had the records been correct").

More to the point, we do not see that DNR's inclusion of the subsistence allowance in Respondents' pensionable compensation was a "deliberate act," and, therefore, not an employer error. PERS does not define a "deliberate act." But, "[u]ndefined words and terms in a legislative enactment will be given their common, ordinary and accepted meaning." Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W. Va. 525, 336 S.E.2d 171 (1984). Deliberate means "[i]ntentional; premeditated; fully considered." *Deliberate*, BLACK'S LAW DICTIONARY (10th ed. 2009). Here, the parties have not pointed to record evidence demonstrating that DNR *intentionally* acted to violate the terms of PERS when it treated the subsistence allowance as pensionable compensation. The two, 1997 memos highlighted by Respondents pertain to the method of reporting and payment of the allowance for tax purposes. While one memo states that a deduction will be made from the subsistence allowance for retirement, that statement stems from DNR's conclusion that the subsistence allowance should be reported as wages. Those memoranda do not support the conclusion that DNR intentionally, rather than erroneously, treated the subsistence allowance as pensionable compensation.

"[S]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. Pt. 3, *Smith*, 159 W.Va. at 108, 219 S.E.2d at 361. Recall that the Legislature has appointed CPRB the fiduciary of PERS, W. Va. Code § 5-10-5; authorized

27

July 1, 2015) is a remedial statute that may be applied to correct an error in the Public Employees Retirement System, found at West Virginia Code §§ 5-10-1 to 55, that occurred before July 1, 2015.

## 2. Timely Correction of Overpayments

The Legislature imposed a new obligation upon the Board in 2015: timely action.[75] Under the general error correction rule stated in subsection (a) of § 5-10-44, "[u]pon learning of any errors, the board shall correct errors in the retirement system in a timely manner[.]" In subsection (e), "Overpayments from the retirement system," the Legislature stated the "timeliness" requirement differently: "If any error results in any member, retirant, beneficiary, entity or other individual receiving from the system more than he would have been entitled to receive had the error not occurred, the board shall correct the error in a timely manner."[76] In general subsection (a), the Legislature directed that timeliness be measured from the point at which the Board learns of an error.[77]

---

the Board correct system errors, *id*. § 5-10-44; and granted it the final authority to determine what is, and is not, pensionable compensation. *Id*. § 5-10-2(8). Taken together, those provisions require a narrow approach to "deliberate act," as found in § 5-10-2(12). For those reasons, we conclude that the circuit court erred when it found that the DNR's inclusion of the subsistence allowance in Respondents' pensionable compensation was a "deliberate act," and so not an "employer error" correctable by the Board.

[75] *See id*. § 5-10-44(a) and (e) (2015).

[76] *Id*. § 5-10-44(e).

[77] The circuit court found that the Board did not act timely to correct the erroneous inclusion of the subsistence allowance in Respondents' pensionable income, citing both W. Va. Code § 5-10-44(a) and (e). As discussed above, however, the measures of

Subsection (e) does not contain similar direction. Instead, it requires the Board to correct an error resulting in overpayment in a timely manner, period.[78] Therefore, we now hold that under West Virginia Code § 5-10-44(e) (eff. July 1, 2015), the Consolidated Public Retirement Board shall correct in a timely manner any error that results in any member, retirant, beneficiary, entity or other individual receiving from the Public Employees Retirement System, West Virginia Code §§ 5-10-1 to 55, more than he or she would have been entitled to receive had the error not occurred.

So, the Board's ability to correct overpayments made to Respondents depends on whether the Board's correction effort is timely under § 5-10-44(e).[79] Like the circuit court, we find that it is not. We are astonished that the Board did not recognize this error at any time between March 1997 and April 2014. At that time, while preparing a benefit estimate for Mr. Cogar, the Board "audited his file, and noticed several months of

timeliness under § 5-10-44(a) and (e) are distinct; the latter is more onerous and pertains to overpayments from the retirement system, specifically. The circuit court's analysis, findings, and the majority of the parties' argument on appeal bear on the timeliness inquiry under § 5-10-44(e). So, we limit our review, accordingly, and do not address the timeliness of other courses of corrective action. *See, e.g.*, W. Va. Code § 5-10-44(d) (2015) (pertaining to overpayments to the retirement system by an employee).

[78] *Bullman v. D & R Lumber Co.*, 195 W. Va. 129, 133, 464 S.E.2d 771, 775 (1995) (stating that "every word used [in a statute] is presumed to have meaning and purpose, for the Legislature is thought by the courts not to have used language idly").

[79] Likewise, the Board's ability to prospectively adjust the payment of the benefit to the correct amount, after annuity payments to a retirant or beneficiary have commenced, also depends on the timeliness of the correction, as that term is used in § 5-10-44(e).

atypical salary history," according to the joint stipulation of facts.  But, officers had retired between 1997 and 2014, presenting the Board with opportunities to notice the same atypicality earlier.  Even more concerning, the Board offers no explanation why it audited that particular file at that particular time, so we are left to conclude that the Board uncovered the error by happenstance.

The Board contends that it could not have known before 2014 that DNR was including the allowance in officers' gross salaries because DNR did not report the allowance separate from the officers' pensionable compensation.  That argument falls flat. Under West Virginia Code § 5-10-29(c) (2015), the Board has the authority to tell participating public employers like DNR what "supporting data" they must provide when paying members' contributions into the system.[80]  Similarly, § 5-10-19 obligates employers to file a "detailed statement of all service rendered" by each employee, but, again, "in such

---

[80] W. Va. Code § 5-10-29(c) (2015) ("(c) The officer or officers responsible for making up the payrolls for payroll units of the state government and for each of the other participating public employers shall cause the contributions, provided in subsection (b) of this section, to be deducted from the compensations of each member in the employ of the participating public employer, on each and every payroll, for each and every payroll period, from the date the member enters the retirement system to the date his or her membership terminates. When deducted, each of said amounts shall be paid by the participating public employer to the retirement system; said payments to be made in such manner and form, and in such frequency, and shall be accompanied by such supporting data, as the board of trustees shall from time to time prescribe. . . .").

form as the board shall from time to time prescribe," along with "such other information as the board shall require in the operation of the retirement system."[81]

Second, as described in the joint stipulation of facts, the Board offers training to the payroll personnel of participating employers like DNR, "addressing amounts from which PERS contributions must or must not be taken." So, the Board recognizes that employers' payroll personnel make foundational decisions about what is and what is not pensionable compensation, and that they need guidance to do so correctly under the terms of PERS. Certainly, the issue here—the erroneous inclusion of the allowance in Respondents' pensionable compensation—could have been avoided had DNR sought the Board's guidance in 1997. But, its failure to do so cannot negate the Board's fiduciary duties to maintain the terms of the trust contract set forth in the PERS statute, dispose of PERS funds according to those terms, and protect the interests of all PERS beneficiaries.[82]

---

[81] The Legislature amended § 5-10-19 in 2021. *See* 2021 W. Va. Acts 10. The amendment does not change the language quoted above.

[82] The Board suggests that the outcome of this case will require it to "audit[] each and every individual participating in the plan each month in an ongoing basis," and that it lacks resources to satisfy that requirement. That is not the holding of this case. And, as we explained in *West Virginia Consolidated Public Retirement Board v. Wood*, 233 W. Va. 222, 231 n.12, 757 S.E.2d 752, 761 n.12 (2014), "such policy arguments [are] more appropriately addressed to the Legislature. This Court's obligation is to interpret and apply the provisions of an ambiguous statute, not to address the financial or public policy underpinnings of such statutory provisions."

31

In sum, the Board has failed to act in a timely manner to correct system overpayments that resulted from the erroneous treatment of subsistence allowance payments as pensionable compensation. Consequently, the Board may not require Respondents who have received overpayments from PERS due to that error to repay those amounts.[83] For the same reason—a lack of timeliness, as that term is found in § 5-10-44(e)—the Board may not prospectively adjust payments to those retirant- and beneficiary-Respondents to whom annuity payments have already started.[84]

## IV. CONCLUSION

For the reasons discussed above, we affirm in part and reverse in part the circuit court's order and remand for further proceedings.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED FOR FURTHER PROCEEDINGS

---

[83] *See* § 5-10-44(e). Section 5-10-44(e) provides that:

> If any error results in any member . . . receiving from the system more than he would have been entitled to receive had the error not occurred, the board shall correct the error in a timely manner. If correction of the error occurs after annuity payments to a retirant or beneficiary have commenced, the board shall prospectively adjust the payment of the benefit to the correct amount.

So, for the same reason of timeliness, the Board may not prospectively adjust payments to those retirant- or beneficiary-Respondents to whom annuity payments have already started.

[84] *Id.*